UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-81128-CV-SINGHAL/MATTHEWMAN

NAKAVA, LLC, a Florida
Limited Liability Company,

      Plaintiff,

v.

THE SOUTH PACIFIC ELIXIR COMPANY,
a Florida for Profit Corporation,

      Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Nakava, LLC ("Plaintiff" or "Nakava LLC") sued Defendant The South Pacific Elixir Company ("SPEC" or "Defendant") for trademark infringement, *see* 15 U.S.C. § 1114, emanating from SPEC's continued use of Nakava LLC's registered trademark "Nakava" ("Mark"). A bench trial was held on January 26 and 27, 2022 via Zoom.  Trial consisted of live testimony from a representative of each party and documentary evidence.

In mid-2020, the parties filed cross-motions for summary judgment, inclusive of substantial documentary evidence and briefing.  The Court denied both motions but examined the case in its Order on Motions for Summary Judgment dated August 10, 2020 ("Order on Summary Judgment").  (DE [65]).  The parties based their Pretrial Stipulation on the Order on Summary Judgment and, in doing so, substantially limited the issues for trial.  The Pretrial Stipulation provides that,

On August 10, 2020, the Court entered an order on summary judgment, disposing of several issues in the case, holding that two issues remain for determination by the factfinder:

> The factfinder must determine whether Nakava LLC abandoned the Mark at some point between 2005 and 2019. Further, assuming Nakava LLC owned the Mark for the duration of that time period, a factfinder must determine whether SPEC's continued use without Nakava LLC's permission is likely to cause confusion in the marketplace.

(DE [65] at 22).

* * *

> Also remaining for determination is the amount of damages to which Nakava, LLC is entitled if it succeeds in establishing that it did not abandon the Mark and that SPEC's continued use of the Mark without permission is likely to cause confusion in the marketplace.

Accordingly, the parties limited their trial presentations to abandonment, likelihood of confusion and damages. *G.I.C. Corp. v. United States*, 121 F.3d 1447, 1450 (11th Cir. 1997) (parties are bound by their stipulations and pretrial stipulation frames the issues for trial).   While the Pretrial Stipulation suggested that affirmative defenses other than abandonment could have been presented at trial, the Court finds that none were presented. The Court makes the following findings of fact and conclusions of law.

I.    **FINDINGS OF FACT**

The evidence at trial established that three entrepreneurs (Jeffrey Bowman, Diane Lysogorski, and Laurent Olivier) (collectively, "Founders") formed Defendant The South Pacific Elixir Company in 2001 for the purpose of operating a kava bar in South Florida. They initially named the kava bar "Nakamal." Shortly after opening the kava bar, they decided to undertake franchising opportunities. SPEC applied to protect the name

"Nakamal," but the U.S. Patent and Trademark Office ("USPTO") denied the application. SPEC tried again, filing an application for protection of the wordmark "Nakava," a portmanteau of "Nakamal" and "kava." A little over a year after Nakava LLC was formed, the trademark application for the Mark was granted.  Tr. Exh. 59.

On summary judgment, the Defendant argued the Mark had been fraudulently obtained, but no such argument or evidence was presented at trial.  On the contrary, the Defendant conceded validity of the Mark. *See* (DE [114-50], at 15).[1]

### A.  SPEC Assigns the Mark to Nakava LLC ("2005 Assignment")

On May 25, 2005, SPEC assigned the Mark to Nakava LLC, including "the entire interest and the goodwill."  (DE [114-35]). Nakava LLC recorded the assignment with the USPTO.  (DE [114-36]). Then, Nakava LLC set out to sell franchises for kava bars under the Mark, acting as the franchisor within the contemplated franchise system.  It was also contemplated that the franchisees would purchase kava bearing the Mark from Nakava LLC. Nakava LLC permitted SPEC to operate a kava bar under the Mark and thus become the first franchise within the franchise system. The parties never executed a written license for SPEC's use of the Mark but instead operated under an implied license.

### B.  Use of the Mark From 2005 to 2015

Nakava LLC rented space in Boca Raton, Florida, for the franchise operation headquarters, and began rolling out its business infrastructure, such as designing a

---

[1]   The Defendant tendered Laurent Olivier as its corporate representative for deposition, but called Alex Gimelstein to testify at trial instead.  Excerpts from Mr. Olivier's corporate representative deposition were admitted into evidence as Exhibit 101 (DE [114-50]).  The Defendant is bound by Olivier's testimony. *See* Fed. R. Civ. P. 32(a)(3); *Coach, Inc. v. Visitors Flea Market, LLC*, 2014 WL 2612036, at *3 (M.D. Fla. 2014). When asked at trial about the validity of the trademark and SPEC's assignment of it to Nakava LLC, Mr. Gimelstein testified that he deferred to Mr. Olivier's testimony.  (DE [113], at 55).  The testimony at trial revealed that Mr. Olivier is no longer associated with the Defendant. *Id.* at 42:13-14.

website and preparing a franchise-offering circular, a franchise agreement and marketing materials.  (DE [114-38, 114-39, 114-44, 114-45]).  Unfortunately, the franchise business model did not succeed as envisioned and, after several years of struggle to sell franchises, Nakava LLC shifted its focus to selling kava online.

At trial, Nakava LLC presented extensive evidence of sales of products bearing the Mark.  First, it presented packaging utilized for more than a dozen unique Nakava products, each of which displayed the Mark.  (DE [114-1, 114-2, 114-3, 114-5, 114-6, 114-6, 114-7, 114-8, 114-9, 114-10, 114-11, 114-12, 114-13, 114-14, 114-15]).  Next, Nakava LLC connected its packaging evidence to sales activity. Specifically, Nakava introduced composite exhibits for each year from 2005 through 2022 containing selected invoices, receipts, and cancelled checks reflecting sales of each of the Nakava-branded products for which packaging evidence had been presented.  (DE [114-17, 114-18, 114-19, 114-20, 114-21, 114-22, 114-23, 114-24, 114-25, 114-26, 114-27, 114-28, 114-29, 114-30]; DE [119-1, 119-2, 119-3, 119-4, 119-5, 119-6, 119-7, 119-8, 119-9, 119-10]). The Court finds Nakava LLC presented evidence that it has sold at least 15 different Nakava-branded products for 17 years.

For its part, the Defendant's corporate representative testified that he did not have "any knowledge of anything Nakava LLC has done other than what's in the public domain and on the Internet."  (DE [113], at 39: 9-12). The Defendant did not present any evidence to controvert Nakava LLC's sales evidence.

Only select sales were presented at trial due to the volume of Nakava LLC's sales. The testimony on behalf of Nakava LLC established that the composite exhibits and the summary were compiled from its voluminous sales records, which were too voluminous

to present at trial, particularly one conducted by video conference. Thus, the Court also admitted into evidence Nakava LLC's summary of its branded products sales, which identifies 41,062 unique sales between 2005 and 2022.  (DE [114-16]); *see* Fed. R. Evid. 1006.

### C.  The SPEC Litigation (2016-2018)

Leading up to trial, SPEC disputed that Nakava LLC sold products bearing the Mark from 2005 forward.  The Defendant changed course at trial, conceding that Nakava LLC sold branded products from 2005 to 2015, and claiming instead that Nakava LLC abandoned the Mark in 2016 by removing it from its retail packaging.

Nakava LLC changed its use of the Mark around the time the parties became engrossed in several lawsuits against one another. *See, e.g.*, *S. Pac. Elixir Co. v. Laurent Olivier et al.*, Case No. 502015CA010112XXXXMB (Fla. 15th Cir. Ct. June 30, 2016) ("SPEC Litigation"). The SPEC Litigation was triggered by a letter sent to Mr. Bowman and SPEC on behalf of Olivier and his investors, led by Alex Gimelstein, from Harry Tempkins, Esquire.  (DE [114-40]).  Mr. Tempkins' letter, a request to inspect the SPEC's books and records, departed from the standard statutory-driven script in its threat to contact the Internal Revenue Service and Customs, Department of Business and Professional Regulations, to demand a full forensic accounting for ten years, and most of all, the following particularly menacing passage:

> My clients plan to come on to the premises to review the books and records and determine its condition.   They may use force of arms if necessary.
> * * *
> What is your present address and place(s) of employment.[2]

---

[2] The "force of arms" language in the letter is patently ridiculous.  So too is the apparent defense preferred by the letter's author that such language used to be normal.  If that's the standard, one shudders to think

Litigation over control of SPEC ensued.  But Mr. Bowman believed it was better to walk away from SPEC than to litigate with Gimelstein's group:

> I was spending so much time and so much money on litigation that it just was getting to the point where it didn't seem that it was worth it to continue to pursue it. It seemed like we weren't going to ever be able to work together and it would be better if we just went our separate ways.

(DE [112], at 81).

Mr. Bowman offered Gimelstein's group an Agreed Order,[3] pursuant to which Bowman and Lysogorski relinquished control of SPEC to the Gimelstein's group.  Mr. Bowman believed the Agreed Order resolved the SPEC Litigation, but it was just getting started:   Olivier's investors brought new claims against Mr. Bowman in the SPEC Litigation, Olivier sued Nakava LLC and the other Founders, and Olivier's investors sued Mr. Bowman individually for defamation.

Faced with threats of the "force of arms", and multiple lawsuits, Nakava LLC became concerned that Olivier and his investors might attempt to claim ownership of product bearing the Mark:

> I was very concerned about it. I had already received a letter that these men wanted to come into my home or businesses with weapons to try to seize corporate records, and it wasn't crazy to think that they would come into my home or business with weapons trying to cease property if they thought they could find it, inventory particularly. And I had to do something to protect the corporate inventory. I had a fiduciary duty to protect the corporate inventory.

---

what else is said at that law office and just shrugged off.  It should be noted that the letter's author, Harry Tempkins, was not connected to this case.  Counsel on this bench trial on both sides handled the case admirably.  Mr. Tempkins, however, is the poster child for why those sworn in to The Florida Bar prior to 2011 ought to have to now take the new Oath which includes the civility and professionalism paragraph.

[3] Throughout trial, the Agreed Order was inaccurately described by the Defendant as a temporary restraining order.  However, the Agreed Order denies a motion for temporary restraining order filed by SPEC.

(DE [112], at 84).

Thereafter, Nakava LLC removed the Mark from its retail packaging.  However, it continued to make large wholesale sales of Nakava branded products throughout the Litigation:

> We continued to sell wholesale kava to kava bars as we always had. We continued right on with the wholesale because, really, that was one of our main focuses at the time was to try to sell more wholesale kava because the market is bigger for wholesale products because it's going directly to kava bars where there are more people that are drinking kava than people drinking kava in their homes.

(DE [112], at 85).  The wholesale kava was branded with the Mark.  (DE [118-1]).

### D. Post-Litigation

After the SPEC Litigation settled, Olivier dismissed his lawsuit against Nakava LLC on the eve of trial. (DE [114-41]); (DE [112], at 86). Nakava LLC then sent two letters ("May 2019 Letters") to SPEC, terminating its use of the Mark. Nakava LLC demanded SPEC immediately stop using the Mark as the name of the kava bar, giving a deadline for compliance of May 30, 2019.  Because SPEC continued to use the Mark in defiance of the two letters, Nakava LLC filed this action on August 9, 2019.

## II.  <u>CONCLUSIONS OF LAW</u>

To prevail on a claim for trademark infringement, a plaintiff must show that "(1) its mark was used in commerce by the defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983) (citing 15 U.S.C. § 1114(1)(a)); *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1475 n.3 (11th Cir. 1991) (holding the analysis for trademark infringement under

the Lanham Act also applies to claims for unfair competition); *Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1239, 1250 (S.D. Fla. 2002) ("The legal standard for federal trademark and unfair competition, and for common law trademark infringement, are essentially the same."). It is axiomatic that, to prove the first prong, the plaintiff must show "that it had trademark rights in the mark or name at issue," *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 358 (11th Cir. 1997).

### A. First Prong: Use of the Mark in Commerce Without Nakava LLC's Consent

To satisfy the first prong, Nakava LLC must prove four separate factors: (1) it had "rights in the Mark" (simply, that it owns the Mark); (2) that its granting SPEC rights to use the Mark was a license; (3) that it terminated the license upon sending the cease-and-desist letter; and (4) that SPEC continued to use the Mark in commerce. *See Burger King Corp.*, 710 F.2d at 1492; *Lone Star Steakhouse*, 106 F.3d at 358.  The Court will address each of these requirements in turn.

#### 1. Ownership of the Mark

SPEC filed the application for and owned the Mark until 2005.  Pursuant to the 2005 Assignment, Nakava LLC took ownership of the Mark in 2005.  *See Sream, Inc. v. Grateful J's, Inc.*, 2017 WL 6409004, at *3 (S.D. Fla. Oct. 13, 2017) ("[A]ssignment of a trademark under the Lanham Act requires (1) sale or transfer of all rights in the mark; and (2) assignment as well of the business's goodwill connected with the mark's use."). SPEC did not present evidence or argument to the contrary at trial.  Therefore, for the first factor—ownership of the Mark—Nakava LLC has owned the Mark since the 2005 Assignment.

#### 2. The Grant of Use as an Implied License

8

Following the 2005 Assignment, Nakava LLC allowed SPEC to continue operating the kava bar under the name bearing the Mark. The only way to interpret this is an implied license by Nakava LLC to SPEC. *Coach House Rest., Inc. v. Coach & Six Rests. Inc.*, 934 F.2d 1551, 1563 (11th Cir. 1991) ("Acquiescence to one's use of a trademark is analogous to an implied license to use the mark").

### 3.  Termination of the Implied License

It is well established that an implied license is terminable at will. *Menendez v. Holt*, 128 U.S. 514, 524 (1888). Nakava LLC's May 2019 Letters therefore terminated the implied license for SPEC to use the Mark. *See, e.g.*, *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 2005 WL 8160544, at *6 (N.D. Ga. Mar. 24, 2005).

### 4.  Continuing Use of the Mark

The final factor of the first prong—that SPEC continued to use the Mark in commerce after Nakava LLC attempted to terminate the implied license—is undisputed. SPEC concedes that it continues to use the Mark today.

### B.  Second Prong: Likelihood of Confusion

For the second prong, courts in the Eleventh Circuit typically "consider seven factors when determining whether or not a likelihood of consumer confusion exists: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' trade channels and customers; (5) similarity of advertising media; (6) the defendant's intent; and (7) actual confusion." *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat. Univ., Inc.*, 91 F. Supp. 3d 1265, 1274 (S.D. Fla. 2015); *see also ATP Sci. Proprietary, Ltd. v. Bacarella*, 2020 WL 3868701, at *4–6 (S.D. Fla. July 9, 2020). "Of these factors, the type of mark and evidence of actual confusion are considered the most

important." *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1274. Moreover, these factors "are just that—factors." *ATP Sci. Proprietary, Ltd.*, 2020 WL 3868701, at *6; *see also You Fit, Inc. v. Pleasanton Fitness, LLC*, 2013 WL 521784, at *2 (M.D. Fla. Feb. 11, 2013) (cleaned up) ("When balancing the factors, the issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists.").

In certain circumstances, however, likelihood of confusion may be found to exist without resort to the seven factors. It is well settled that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, establishes likelihood of confusion.  *See, e.g., Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1002 (S.D. Fla. 1992) (citing *Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562, 1566 (11th Cir.1986)); *Professional Golfers Ass'n of America v. Bankers Life & Casualty Co.,* 514 F.2d 665, 670 (5th Cir.1975); *In re Gainesville P–H Properties, Inc.,* 77 B.R. 285, 294 (Bankr. M.D. Fla. 1987)); *Dunkin' Donuts Franchised Restaurants LLC v. EMST Donuts, LLC*, 2007 WL 9718746 (M.D. Fla. 2007).

In *Burger King v. Mason*, the Eleventh Circuit observed that "[c]ommon sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks." 710 F.2d at 1493.  And "[b]ecause of this risk, many courts have held that continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement." *Id*. (cleaned up). Thus, because a franchisor proved that its franchisee employed trademarks after the franchise agreements were cancelled, such use was deemed to likely cause confusion—independent of the seven-factor

analysis. *Id.; see  Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1504 (S.D. Fla. 1995) (likelihood of confusion inevitably results from use of the subject trademark); *Majeed*, 805 F. Supp. at 1003 (there can be "no result other than to cause actual [consume]r confusion" when a former franchisee continues to use the proprietary marks of the franchisor); *Dunkin' Donuts,* 2007 WL 9718746, at *8 (cleaned up) (finding "numerous courts have recognized the strong likelihood of consumer confusion in such circumstances and, consequently, have found a substantial likelihood of success on a trademark infringement claim when the movant has established that the franchise agreement was terminated and the former franchisee continued to operate using the franchisor's marks.").

The Defendant continued using the Mark after its permission to do so was revoked by Nakava LLC's May 2019 Letters. Moreover, the Defendant has admitted in this action and in other litigation that likelihood of confusion exists.  Specifically, in its counterclaim, the Defendant repeatedly alleged that Nakava LLC's use of the Mark was likely to cause confusion.  (DE [28] ¶¶ 66, 67, 72, 78, 79, 83); (DE [113], at 51–53). Similarly, in separate litigation, the Defendant repeated the allegation that Mr. Bowman's kava bar's use of the name "The Nak Kava Bar" is likely to cause confusion.  *See* (DE [118-2]).  Though the Defendant's allegations are not dispositive of the issue in and of themselves, they are "highly persuasive evidence" of likelihood of confusion.  *See Drew Est. Holding Co., LLC v. Fantasia Distribution, Inc*., 875 F. Supp. 2d 1360, 1370–71 (S.D. Fla. 2012) (for infringer to allege similarity of a mark and later deny the same allegation, "all within the span of a single lawsuit [] could well be called 'improper use of judicial machinery'") (quoting *Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C. Cir. 1980)).

Stated plainly, the foregoing authorities make an especially strong case for a finding of likelihood of confusion in this instance, independent of the seven factors. The foregoing notwithstanding, the seven factors also weigh in favor of likelihood of confusion.

1.  The Type of Mark

The Eleventh Circuit instructs the district courts first to classify the type of mark to determine "whether it is strong or weak." *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) (establishing four categories of marks: generic, descriptive, suggestive, and arbitrary). Of the four categories, arbitrary marks, those that bear no relationship to the product, "are the strongest." *Id.* Here, the Mark is an arbitrary mark, entitled to the strongest protection under the case law, because it is an amalgamation of two words. Defendant offered no evidence or argument to the contrary. Accordingly, this prong favors Nakava LLC.

2.  The Similarity of the Mark

For the second factor, the Court is to "compare[ ] the marks and consider[ ] the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling Enters.*, 192 F.3d at 1337. This prong demands no serious analysis; Nakava LLC and SPEC use the exact same mark. Thus, this prong weighs in favor of Nakava LLC, as well. *See, e.g.*, *Eli Research, LLC v. Must Have Info Inc.*, 2015 WL 5934611, at *5 (M.D. Fla. Oct. 6, 2015 ("Defendants use the exact same mark as AAH—the CPC mark. As such, the similarities of the mark indicate to the Court that the use of the CPC mark is likely to cause confusion").

3.  The Similarity of the Products the Mark Represents

For the third factor, "the Court must examine whether the parties' services [and products] are the kind that the public attributes to a single source." *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1277 (cleaned up). "The greater the similarity between the products and services, the greater the likelihood of confusion." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 976 (11th Cir. 1983). This inquiry "does not turn on whether the services can be distinguished by consumers, but on whether the services are so related in the minds of consumers that they get the sense that a single producer is likely to offer both services." *Fla. Int'l Univ. Bd. Of Trs.*, 91 F. Supp. 3d at 1278 (cleaned up).

Minor differences in the product do not render them dissimilar for purposes of this analysis. As the Eleventh Circuit in *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525 (11th Cir. 1985) observed,

> The lower court found that "[t]he *products* [wine as compared to cognac or brandy], to the drinking world, are dissimilar." The question, however, is not whether the purchasing public can readily distinguish wine from cognac but whether the products are the kind the public attributes to a single source. As our predecessor court has noted, "[t]he greater the similarity between the products and services, the greater the likelihood of confusion." Moreover, the rights of the owner of a registered trademark are not limited to protection with respect to the specific goods stated on the certificate—for Remy Martin, cognac and brandy—but extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods.
>
> Here, Remy Martin's products, cognac and brandy, are distilled from Myers' type of product, wine. To us it appears quite likely that, even assuming a sophisticated consumer from the drinking world, such a consumer could easily conclude that Remy Martin had undertaken the production and sale of wine and that its name and goodwill therefore attached to Myers' product, both products originating in France. Contrary to the lower court's finding, there is thus a high degree of similarity between the goods.

*Id*. at 1530 (footnotes omitted).

The evidence at trial established that, like Nakava LLC, the Defendant also sells kava powder under the name "Manakava." (DE [113], at 55:19–56:11). The products the parties sell—kava powder and kava beverages—are undeniably similar, if not identical. Accordingly, this factor also weighs in favor of Nakava LLC.

### 4.   The Similarity of the Parties' Trade Channels and Customers

"Likelihood of confusion is more probable if the products are sold through the same channels to the same purchasers." *Deltona Transformer Corp. v. Wal-Mart Stores, Inc.*, 115 F. Supp. 2d 1361, 1369 (M.D. Fla. 2000). It follows that "[d]issimilarities between the retail outlets for the parties' services reduce the possibility of confusion." *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1184 (11th Cir. 1985); *see also Fehling*, 192 F.3d at 1339. "This factor takes into consideration where, how and to whom the services are sold. The Court also must consider the level of sophistication and investment required of the parties' customers, which can influence the likelihood of confusion based on a mark." *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1279 (internal citation omitted).

Even where the parties' channels differ, overlap of channels favors a finding of likelihood of confusion. *Id.* ("While 'the parties' outlets and customer bases need not be identical, some degree of overlap should be present' to weigh in favor of a likelihood of confusion.") (quoting *Frehling*, 192 F.3d at 1339); *Tracfone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1330–31  (S.D. Fla. 2015) ("The Court finds that TracFone has shown a sufficient overlap in trade channels used by the Parties, and this factor favors a finding of likelihood of confusion.").

Applied here, both Nakava LLC and Defendant sell kava powder. (DE [113], at 55:19–56:11). Moreover, both sell branded products at local kava bars, and both sell kava powder and beverages to kava drinkers at kava bars in the same geographic area.  The evidence at trial demonstrated that the local end-consumers of kava are transitory and go between kava bars to consume and purchase kava.  (DE [112], at 108:2–10). Critically, however, Nakava LLC primarily sells its Nakava-marked products through its ecommerce site, unlike Defendant who primarily sells at its kava bar. Furthermore, Nakava LLC sells the product on its ecommerce site to both consumers and wholesalers, unlike Defendant who primarily sells to retail consumers. While there may be some overlap in customers—retail consumers may shop both online and in-store—there is no overlap in trade channels because Defendant's trade channel is in-store whereas Nakava LLC's trade channel is online. Accordingly, the Court finds that this factor slightly weighs against Nakava LLC.

### 5.  The Similarity of Advertising Media

For the fifth factor, the Court considers the advertising media used by each party. *Deltona Transformer Corp.*, 115 F. Supp. 2d at 1369. Clearly, "[i]f a plaintiff and defendant both use the same advertising media, a finding of likelihood of confusion is more probable." *Id.* "A court may properly consider the overall advertising campaigns." *Id.* The evidence at trial established that both parties use the internet, social media, and kava bars for advertising.  (DE [112], at 108:11-15).  Accordingly, this factor weighs in favor of Nakava LLC.

### 6.  The Defendant's Intent

"In determining whether consumer confusion is likely, the Court must also examine the defendant's intent, to determine whether the defendant 'had a conscious intent to

capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper intent.'" *Fla Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1281 (quoting *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 648 (11th Cir. 2007)). "[L]ikelihood of confusion can be found as a matter of law if Plaintiff shows that Defendants intended to derive benefit from Plaintiff's trademark." *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1354 (S.D. Fla. 2002).

"While objective factors are most important in assessing the likelihood of confusion between two marks, courts also examine the defendant's subjective intent." *Canes Bar & Grill of S. Fla., Inc. v. Sandbar Bay, LLC*, 343 F. Supp. 3d 1236, 1244 (S.D. Fla. 2018). Subjective intent, no matter the cause of action or type of proceeding before a court, almost never can be proved by direct evidence. *See Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 1981 WL 40564, at *6 (N.D. Ga. May 15, 1981) ("Since improper motive is rarely, if ever, admitted ... the court can only infer bad intent from the facts and circumstances in evidence.").

No great inference is required here to conclude SPEC intended to capitalize on the Mark.   This inference naturally follows from the fact that the Defendant continued to use the Mark after Nakava LLC revoked its permission to do so.  This is the definition of intent. *Clayton v. Howard Johnson Franchise Sys. Inc.,* 730 F. Supp. 1553, 1559 (M.D. Fla. 1988) ("after termination of the License Agreement [defendants'] refusal to choose a different name for the plaza and inn shows an *intent* to continue trading on the 'Howard Johnson's' mark").

An infringer who is notified that they are infringing but who nonetheless continues to infringe demonstrates intent.  *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp.

2d 1279, 1288–89 (S.D. Fla. 2010) (finding "willfulness may be inferred by the fact that [the infringer] deliberately continued" to infringe, ignoring the trademark holder's demands); *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1220 (S.D. Fla. 2004) (finding intentional infringement where infringer continued use of the mark after receiving several cease and desist letters).  In this instance, the Defendant knew that the Mark was owned by Nakava LLC, knew that it was using the same Mark, knew that its implied license to use the Mark had been expressly terminated, and yet nonetheless continued to use the Mark.

The Defendant not only continued to use the Mark after Nakava LLC revoked its permission to do so, but also (i) filed a countersuit which it ultimately abandoned, (ii) filed an action in the USPTO to cancel the Mark, and (iii) filed a state court action against Nakava LLC. (DE [113], at 48:9–50:9).  Defendant maintained in all of the foregoing matters that Nakava LLC did not use the Mark, and Defendant's representative admitted at trial that Defendant "sold Nakava-branded products at The Nakava Bar." *Id*. at 50:16–51:5. The Defendant's litigation strategy evidences its intent to derive benefit from the Mark.

As noted above, the Defendant also testified at trial that it sells kava powder under the name "Manakava." *Id*. at 55:19–56:11.  Manakava is, of course, the Mark with "Ma" added to it.  The Defendant's decision to sell kava powder under the Manakava brand is consequential.  The Defendant has argued that likelihood of confusion is not present in this case because of the differences in Nakava LLC's and SPEC's business operations, relying particularly on the fact that Nakava LLC sells kava powder.  However, the fact that Defendant has branded its product with such a closely-similar spelling to Plaintiff's

product evidences intent to derive benefit from the mark and additionally adds evidence to the likelihood of confusion factor. For these reasons, the Court finds the sixth factor heavily weighs in favor of Nakava LLC.

7.   Evidence of Actual Confusion

As for the seventh and final factor, "evidence of actual confusion ... is the best evidence of the likelihood of confusion...." *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1282. There is no litmus test; cases instruct of no magical amount of evidence of customer confusion a party must show. *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 937 (11th Cir. 2010). In fact, "the quantum of evidence needed to show actual confusion is relatively small." *Id.*

At trial, Mr. Bowman described several instances of customers who confused the Defendant for Nakava LLC.   One of the customers posted an online review of the Defendant on Nakava LLC's profile.  (DE [114-47]); (DE [112], at 108–14).  Mr. Bowman also testified that mail directed to one company has been delivered to the other.  (DE [112], at 114–15).  *See Tortoise Island Homeowners Association, Inc. v. Tortoise Island Realty, Inc.*, 790 So. 2d 525, 534 (Fla. 3d DCA 2001) (evidence that entities "received mail and telephone calls intended for the other" demonstrated actual confusion).   Mr. Bowman also explained that the two companies are entangled on the internet such that a search on Google for one yields "a mixture of Nakava, SPEC-Nakava, and Nakava LLC."  (DE [112], at 115:21-23).

The burden on the defending party to disprove actual confusion is much greater than that on the moving party.  As the Fifth Circuit has stated: "[R]eason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of

confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971).  In this instance, the Defendant offered no evidence that confusion does not exist.  On the contrary, the Defendant's counterclaim in this case and allegations in separate litigation affirmatively allege confusion.  *See* (DE [28] ¶¶ 66, 67, 72, 78, 79, 83); (DE [113], at 51–53); (DE [118-2]).

All of the seven factors in this instance, but for one, favor a finding of likelihood of confusion.  Accordingly, the Court finds that together the factors weigh substantially towards a finding of likelihood of confusion.

### C.  Defendant Failed to Prove its Affirmative Defense of Abandonment

Defendant contends Nakava LLC abandoned the Mark.  "Under the Lanham Act, a federally registered trademark is considered abandoned if its use has been discontinued with intent not to resume use."  *Buccallati Holding Italia SPA v. Laura Buccellati, LLC*, 5 F. Supp. 3d 1368, 1376 (S.D. Fla. 2014).  Mere non-use of a mark does not constitute abandonment.  *Id*.  The statute provides,

> A mark shall be deemed to be 'abandoned' either:
>
> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.
>
> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C. § 1127.

The Defendant's abandonment defense has changed significantly throughout this case.  In its affirmative defenses, it alleged that "Plaintiff ceased use of the mark in 2005." (DE [28], at 7). In its motion for summary judgment, the Defendant maintained that Nakava LLC "discontinued" use of the Mark "for many years" with no intent to resume using it *until* it filed new applications with the USPTO in February 2016, and only for the purpose of "damaging SPEC."  Conversely, at trial, the Defendant argued that Nakava LLC abandoned use of the Mark *beginning with* the SPEC Litigation— late 2015, early 2016.   Finally, contradicting each of the foregoing positions, the Defendant's corporate representative testified that its abandonment defense was based *exclusively* on the notion that Nakava LLC abandoned selling franchises.   *See* (DE [114-50], at 10–11).

Defendants are required to show "strict proof" that a plaintiff abandoned its mark. *See e.g.*, *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir. 1984); *see also  Cumulus Media, Inc. v. Clear Channel Communications, Inc.,* 304 F.3d 1167, 1173–75 (11th Cir. 2002) ("a finding of abandonment works [as] an involuntary forfeiture of rights," thus justifying "a stringent, heavy, or strict burden of proof").  Intent may be inferred from the circumstances, and a rebuttable presumption of abandonment arises when a trademark holder does not use the mark for three years of consecutive nonuse.   *Id*. Nonetheless, the burden of persuasion always remains with the Defendant.  *Id*. at 1175–77.

In this instance, the Defendant did not establish non-use or intent not to resume use of the Mark.  On the contrary, the unrebutted evidence at trial established that Nakava LLC sold products bearing the Nakava Mark from 2005 through 2022.  *See* (DE [112], at

42:13-23) (Bowman testifying Nakava LLC sold branded products since 2005, never stopped and never intended to stop, including during the SPEC Litigation); (DE [114-1, 114-2, 114-3, 114-4, 114-5, 114-6, 114-7, 114-8, 114-9, 114-10, 114-11, 114-12, 114-13, 114-14, 114-15, 114-16, 114-17, 114-18, 114-19, 114-20, 114-21, 114-22, 114-23, 114-24, 114-25, 114-26, 114-27, 114-28, 114-29]). While Nakava LLC's sales of products bearing the Mark declined in 2016, when the SPEC Litigation occurred, Nakava LLC did not cease using the Mark but instead removed it from its retail products alone.  From 2016 through 2019, Nakava LLC continued to use the Mark on wholesale orders which were fewer in number, but nevertheless constitute significant commercial activity due to the size of the transactions.  *See, e.g.*, (DE [119-1, 119-2, 119-3]).

Even if Defendant could establish nonuse for the requisite three-year period in order to shift the burden of production, Defendant must also present "strict proof" of Nakava LLC's intent not to resume use of the Mark.   The Defendant offered three pieces of evidence in support of its contention that Nakava LLC lacked intent to resume use of the Mark.

First, the Defendant argued that an Agreed Order entered in the SPEC Litigation evidenced Nakava LLC's intent to abandon the Mark.  Defendant argued that the Agreed Order was the "catalyst, it's the moment that prompted Mr. Bowman to stop using the Nakava mark."  (DE [113], at 85:8-16).  Whether the Agreed Order did or did not play a role in causing Mr. Bowman to remove the Mark from Nakava LLC's retail packaging is not probative of Nakava LLC's intent to resume use of the Mark.  In this regard, the Court notes that the Agreed Order is not an injunction but instead denied a motion for preliminary injunctive relief.  Further, and more to the point, Nakava LLC was not a party

to the SPEC Litigation and thus was not bound by the Agreed Order, nor does it speak to trademark rights, the Mark, or any other matter relevant to the issue of abandonment or use of the Mark.

Second, the Defendant contends fictitious name filings on behalf of SPEC evidence Nakava LLC's intent to abandon the Mark.  This argument is confusing at best, because the Defendant uses the name Nakava for its bar and therefore does operate under a name that is not the actual name of its business, South Pacific Elixir Company. Accordingly, it makes sense that Defendant would file a fictitious name application because, simply put, it operates under a fictitious name.  *See* (DE [112], at 158:15-16 ("We only listed one because Nakava was doing business under a fictitious name"); *Royal Atlantic Health Spa, Inv. V. B.L.N., Inc*., 677 So. 2d 1385, 1387 (Fla. 4th DCA 1996) (The purpose of the fictitious name statute is to provide notice to one dealing with a business of the real party in interest). In any event, the statute governing fictitious name filings provides that registration has no effect on a trademark.  *See* Fla. Stat. § 865.09(8).  For these reasons, the fictitious name filings are not probative of abandonment.

Lastly, Defendant contends a finding of abandonment is supported by a page from Nakava LLC's "nakamalathome.com" website, which states "Wholesale kava powder is now available from Nakamal At Home aka Nakava LLC.  We will be selling wholesale kava under the Nakava name brand."  There was no evidence establishing when the statement was added to the website, so its relevance to the two elements of the abandonment defense is unclear.   While the Defendant contends the statement demonstrates that Nakava LLC was not selling wholesale kava for some undetermined

period, Mr. Bowman testified that the statement was meant only to communicate that wholesale kava had been added to the website:

> Q. All right. And again, what we were just looking at is here where you're announcing we will be selling wholesale kava under the Nakava name brand. You see that?
>
> A. Okay. I see what's going on here. Yes, that is us putting wholesale branded kava into the shopping cart. It took us a long time to be able to program the shopping cart to be able to sell the wholesale kava, to get it to work. And that was just an announcement that you could start buying it on the – using your credit card to buy it. Previous to that we were selling it and making wholesale deals with people directly. This is for smaller amounts.
>
> Q. That's not what is says there, is it? It says, we will be selling wholesale kava under the  Nakava name brand. Isn't that what it says there?
>
> A. That's not what is says.
>
> Q. That's not what it says?
>
> A. It says, wholesale kava powder is now available from Nakamal At Home. But that doesn't mean it wasn't previously available. It just means that it's available for sale on that website directly through the shopping cart.

(DE [112], at 133:23–134:17).  Mr. Bowman's testimony is corroborated by invoices reflecting wholesale transactions.  *See* (DE [119-1, 119-2, 119-3, 119-4, 119-5, 119-6, 119-7, 119-8, 119-9]).  Indeed, Nakava LLC's Profit & Loss Statements distinguish sales processed on the nakamalathome.com website and wholesale transactions and reflect substantial wholesale sales throughout the relevant period.  *See id*.

In the end, Defendant's evidence of intent falls far short of "strict proof." Defendant's evidence is also contradicted by Nakava LLC's evidence of sales of branded

product following settlement of the SPEC Litigation and Mr. Bowman's unrebutted testimony that he always intended to continue using the Mark.

Sporadic use of a mark does not constitute abandonment. *Citibank, N.A. v. Bitibanc Group, Inc.*, 724 F.2d 1540, 1545 (11th Cir. 1984) ("Although the plaintiff admittedly used Citibank only sporadically before 1976, the use was fairly continuous and clearly sufficient to justify the district court's finding that plaintiff never intended to discontinue using the name"). As this Court observed in *Cotton Ginny, Ltd. v. Cotton Gin, Inc.*,

> If the proponent of a mark stops using it but demonstrates an intent to keep the mark alive for use in resumed business, the mark retains 'residual' goodwill and thus continues to enjoy trademark protection, as long as it retains its significance as an indication of the origin of the goods and services.

691 F. Supp. 1347, 1357 (S.D. Fla. 1988) (quoting *Pan American World Airways, Inc. v. Panamerican School of Travel, Inc.*, 648 F. Supp. 1026, 1031 (S.D.N.Y), *aff'd*, 810 F.2d 1160 (2d Cir. 1986)).

The record before the Court is clear that Nakava LLC has not abandoned the Mark. Even assuming its sporadic use during the SPEC Litigation constituted "non-use" within the meaning of the Lanham Act, the evidence at trial demonstrated that Nakava LLC intended to resume use of the Mark once litigation with Defendant was substantially resolved.

### D. Damages

Under the Lanham Act, damages for trademark infringement may include (1) the Defendant's profits, (2) any damages sustained by the plaintiff, and (3) the cost of the action. *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1564 (11th Cir. 1986).

This Court has "wide discretion in determining a just amount of recovery for trademark infringement." *Id*. at 1564–65.  Lanham Act damages may be awarded even when they are not susceptible to precise calculations. *Id*. at 1565.  A defendant's testimony, alone, provides a sufficient evidentiary basis for the Court to assess its profits. *See Louis Vuitton S.A. v. Spencer Handbags Corp*., 765 F.2d 966, 972 (2d Cir. 1985) (holding that court's reliance "on Rands' statements. . . for proof of the amount of damages" was proper).

"[T]he law in this Circuit is well settled that a plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits under § 35 of the Lanham Act." *Burger King*, 855 F.2d at 781. A plaintiff shall be entitled to a defendant's profits if any of three circumstances exist: (1) the defendant's conduct was willful and deliberate; (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct. *Optimum Techs, Inc. v. Home Depot U.S.A., Inc*., 217 Fed. Appx. 899, 902 (11th Cir. 2007) (cleaned up).

Nakava LLC is entitled to Defendant's profits because the Defendant's conduct was willful and deliberate.   An infringer who is notified that they are infringing but who nonetheless continues to infringe demonstrates willfulness. *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1288–89 (S.D. Fla. 2010) (finding "willfulness may be inferred by the fact that [the infringer] deliberately continued" to infringe, ignoring the trademark holder's demands); *PetMed Express, Inc. v. MedPets.Com, Inc*., 336 F. Supp. 2d 1213, 1222 (S.D. Fla. 2004) (finding willful infringement where infringer continued use of the mark after receiving several cease and desist letters).   In this instance, the Defendant knew that the Mark was owned by Nakava LLC, knew that it was using the self-same Mark, knew that its implied license to use the Mark had been expressly

terminated, yet nonetheless continued to use the Mark.  Defendant offered no justification for its infringement at trial other than its affirmative defense of abandonment.  But the fact that an infringer alleges affirmative defenses is not probative of its intent to infringe.

Notably, in its abandoned counterclaim, the Defendant alleged that Nakava LLC's use of the Nakava trademark has caused Defendant "loss of cash flow and revenue and daily sales", and "loss of brand equity."  (DE [112], at 52). The counterclaim not only concedes the monetary impact of infringement in this instance, it demonstrates that Defendant's infringement was indeed deliberate.   As further evidence of its deliberateness, in addition to its abandoned countersuit, the Defendant filed (i) an action in the USPTO to cancel the Mark and (ii) an action against Nakava LLC in state court for infringement.   (DE [113], at 48:9–50:9).   Finally, the fact that another one of Mr. Gimelstein's many businesses[4] was found to have committed trademark infringement, while not dispositive, is noteworthy.  (DE [113], at 61:5–62:2).

In order to show the amount of profits to be disgorged, a plaintiff must establish the infringer's gross sales; the burden then shifts to the Defendant to refute the amount and/or to proffer costs that should be deducted from the gross sales. *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488 (11th Cir. 1987).   The evidence at trial demonstrated that the Defendant earned profits under the Nakava Mark of $148,350 from May 2019 to December 2020, $11,000 in March 2021, $29,500 in April 2021, $5,000 in June 2021, $5,000 in August 2021, $5,000 in September 2021, and $5,000 in October 2021.  (DE [114-46, 114-48]); (DE [113], at 56–59).  Eight months of statements were not produced despite this Court's order requiring their production.

---

[4] Mr. Gimelstein testified he has owned dozens of companies and has handled ten or fifteen buyouts similar to his purchase of SPEC.  (DE [113], at 60).

However, the monthly average profit throughout the period for which statements were produced is approximately $7,800; therefore, the evidence supports the conclusion that Defendant earned an average monthly profit of $7,800 in the months for which it failed to disclose profit and loss statements in violation of this Court's order.

The Lanham Act provides that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). In this instance, the Defendant offered <u>no</u> evidence of deductions and did not otherwise dispute Nakava LLC's evidence of Defendant's profits. (DE [113], at 56–59). Remarkably, the Defendant disavowed any knowledge concerning the profits SPEC paid out to its owners, even though Mr. Gimelstein had signed the interrogatory answers for SPEC. (DE [113], at 59:7-10) (Q. "Okay. So you don't know anything about this exhibit whatsoever? You just signed under penalties of perjury that it was accurate? A. Yes."). With no deductions so much as mentioned, the Court finds that Nakava LLC is entitled to $271,250.[5]

## III.   CONCLUSION

Having reviewed the testimony of the witnesses, exhibits admitted in evidence, the parties' written submissions, applicable law, and the record, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff Nakava LLC prevails on its claim of trademark infringement under 15 U.S.C. § 1114(1)(a) because it has proven that its mark was used in commerce by

---

[5] $148,350 (May 2019 through December 2020), $11,000 (March 2021), $29,500 (April 2021), $5,000 x 5 = $20,000 (June, August, September and October 2021), and $7,800 x 8 = $62,400 (January, February, May, July, November, December 2021 and January and February, 2022).

Defendant SPEC without Plaintiff's consent, and this unauthorized use was likely to cause confusion, or to cause mistake, or to deceive.

2. Plaintiff Nakava LLC did not abandon the mark because Plaintiff never discontinued use with intent not to resume use.

3. Plaintiff Nakava LLC is entitled to $271,250 in damages under 15 U.S.C. § 1117 against Defendant SPEC, which represents Defendant's profits during the relevant period, because Defendant's conduct was willful and deliberate.

4. Defendant is **PERMANENTLY ENJOINED** from using the Mark henceforth.

5. Defendant shall pay the sum of $271,250 to the Plaintiff within 30 days of entry of Final Judgment.

6. The Court reserves jurisdiction to determine attorneys' fees and costs.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 31st day of July 2022.

RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record via CM ECF